UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FCA ASSOCIATES, and FCA ASSOCIATES, LLC,

              Plaintiffs,                    03-CV-6083T

         v.                              **DECISION and
ORDER**

TEXACO, INC., and TEXACO MARKETING
AND REFINING, INC.,

              Defendants.
_____

TEXACO, INC., and TEXACO MARKETING
AND REFINING, INC.,

              Third Party Plaintiffs,

         v.

RICHARD COHEN, SHELL OIL COMPANY,
FRED ZAMBITO, JOSEPH D'AMICO,
CHARLES S. LEONE, JOSEPH PANZARELLA,
ROSARIO MORREALE, and METRO TIRE AND
AUTO SERVICE CENTER, INC.,

              Third Party Defendants.
_____

## <u>INTRODUCTION</u>

Plaintiffs FCA Associates, a partnership organized under the laws of the State of New York and FCA Associates, LLC, a limited liability company organized under the laws of the State of New York (collectively "plaintiffs" and/or "FCA"), bring this action against defendants Texaco, Inc. and Texaco Refining and Marketing, Inc. ("Texaco Refining") (collectively "Texaco") seeking to recover costs associated with the environmental investigation and remediation of a property located at 697 North Winton Road, City of

Rochester, County of Monroe, State of New York. The Texaco defendants filed a third-party complaint against eight named third-party defendants, including Richard Cohen ("Cohen") and Shell Oil Company ("Shell"), seeking indemnification and/or contribution should Texaco be found liable to plaintiffs. Plaintiffs moved to dismiss Texaco's third-party claims against Cohen and Shell. In addition, Shell moved to dismiss Texaco's third-party claims against it. By Decision and Order dated March 31, 2005, this Court granted plaintiffs and Shell's motions to dismiss Texaco's third-party claims against third-party defendants Shell and Cohen.

Currently for determination are two motions: (1) Texaco's motion for summary judgment dismissing plaintiffs' action against Texaco in its entirety, or in the alternative, partially dismissing plaintiffs' non-remediation damages claims; and (2) Plaintiffs' motion for partial summary judgment holding Texaco liable as dischargers under the New York State Navigation Law and liable for plaintiffs' attorneys' fees pursuant to the Resource Conservation and Recovery Act ("RCRA"). For the reasons set forth below, Texaco's motion for summary judgment is granted in part and denied in part. Plaintiff's motion for partial summary judgment is granted in part and denied in part.

## BACKGROUND

### I. **History of the Site**

On November 1, 1960, Texaco, Inc. became the record owner of

a .44-acre parcel of land improved by a gasoline service station, located at 697 North Winton Road (the "Property").[1] On or about August 1, 1961, Texaco conveyed the Site to Leased Stations, Inc. ("Leased Stations"), predecessor to Texaco Refining whereupon, Leased Stations leased the property back to Texaco. Between 1961 and 1981, Texaco sub-leased the Site to a number of operators and repurchased it from Leased Stations in 1980. On November 3, 1981, Texaco conveyed the Site to Richard Cohen. In addition to the Site conveyed by Texaco, Cohen also owned the Adjoining Parcel upon which a building was located and from which he operated his business known as Nu-Way Auto Parts. In approximately 1985,[2] Cohen leased the Site to Metro Tire and Auto Service Center, Inc. ("Metro Tire"). It is unclear precisely how long Metro Tire was on-site because neither Cohen nor Metro Tire was able to locate an executed lease for any of the time Metro Tire was a tenant, and the parties' recollections differ widely about the date that Metro Tire vacated the Site. At the very least, Metro Tire was on site until 1995. However, there is testimony that places Metro Tire at the Site as recently as 1997 selling retail gas to customers.

In 1970, City records indicate that Texaco installed a 1,000

---

[1] Texaco purchased the Property in 1960, as indicated in the Abstract of Title for the Property. In addition, the Property was also known as 2340 East Main Street and 701 North Winton Road. Plaintiffs also owned the adjoining parcel at 215 Merchants Road (the "Adjoining Parcel"). The Property and Adjoining Parcel will be referred together as the "Site."

[2] City records show that in May 1985, three gasoline USTs were tested. There was no report of any problem with the tanks at that time, or records that they were ever replaced by Metro Tire.

gallon Underground Storage Tank ("UST"). In addition, in 1978, Texaco installed an 8,000 gallon UST and removed three 2,000 gallon USTs. According to Texaco records, the 8,000 gallon UST subsequently developed a leak and the process had to be repeated. Texaco states that it successfully replaced the tank. Indeed, City records show that a permit was issued to install the first 8,000 gallon UST on February 15, 1978, then to repair it on May 1, 1978 and then replace it on May 10, 1978. It is undisputed that 750 gallons of gas was lost during this process. However, no documents have been located with respect to remediation records.

When Cohen purchased the Site from Texaco in 1981, he bought the property as an operating gas station in a "Used" and "As Is" condition.[3] The bill of sale from Texaco to Cohen showed a transfer of the following USTs: two 8,000 gallon USTs, one 3,000 gallon UST, one 550 gallon UST and one 1,000 gallon UST and three 2,000 gallon USTs. Texaco states that these eight USTs were included in the sale. Plaintiffs, however, state that only five USTs were present. According to plaintiffs, the three 2,000 gallon USTs listed on the bill of sale were not conveyed from Texaco to Cohen since those three USTs were already removed by City Pump & Tank in February or March 1978. See Building Records from the City of Rochester

---

[3]Cohen testified that he made no effort at environmental due diligence when he initially bought the Site in 1981. Further, he made no effort to check the age or condition of the USTs when he purchased the property until the mid-1990s when he was preparing to sell it. Plaintiffs argue that it was not customary to undertake environmental due diligence or perform audits in 1981.

4

attached as Ex. D to Pl.'s Statement of Facts.[4] Moreover, Cohen has stated that he never knew how many USTs were on Site during his years of ownership and he had no idea which ones were operational.

## II. **The Agreements**

On January 20, 1999, Cohen sold the Property and the Adjoining Parcel to plaintiff FCA Associates (the "Partnership") pursuant to a Purchase and Sale Agreement.[5] On November 7, 2002, the Partnership transferred its interest in the Property and the Adjoining Parcel to plaintiff FCA Associates, LLC (the "LLC"). In November 1998, prior to closing on the Site, Cohen and plaintiffs entered into a Purchase and Sale agreement relative to three properties, including the Site, wherein plaintiff acknowledged the environmental concerns with the Site and accepted the conditions of the Site. Indeed, prior to purchasing the property, plaintiffs ordered a Phase I environmental Investigation of the Site. The Phase I report recommended further investigation and notified plaintiffs of the environmental concerns. Subsequently, plaintiffs ordered a Phase II Investigation of the Site.[6] As part of the

---

[4]City Pump & Tank replaced the three 2,000 gallon tanks with an 8,000 gallon fiberglass tank that developed a leak by May 1978 and discharged at least 750 gallons of oil, although there is no record of any remediation.

[5]Plaintiffs purchased four properties from Cohen including the Adjoining Parcel one of which was the Nu-Way sites located at 697 North Winton Road. Plaintiffs never operated a gas station at that Site.

[6]Following the Phase I report, plaintiffs requested that Day Environmental ("Day") investigate the sub-surface impact for contamination. Plaintiffs were notified in its Phase II report that there was a concern relating to the contamination under the building in the sump pump area. Day also cautioned plaintiffs prior to closing that there might be additional contamination yet undetected on the Site that could increase remediation costs.

Purchase and Sale Agreement, plaintiffs agreed to indemnify and hold Cohen harmless against future liability for environmental claims associated with the property. Further, pursuant to plaintiffs' Environmental Escrow Agreement dated January 15, 1999, M&T Bank was unwilling to provide plaintiffs with a loan unless plaintiffs agreed to remediate the property. See Ex. Q to January 31, 2007 Cristo Aff. Plaintiffs agreed to remediate the property knowing that Phase I and Phase II investigations had information relating to specified and non-specified environmental concerns.[7]

### III. __Contamination and Remediation at the Site__

In the 1990's, two discharges of petroleum product were discovered in the area of the Site. On September 26, 1994, the Department of Environmental Conservation ("DEC") recorded contamination at the Site which was listed as being a release of unknown gasoline to ground water. A 3,000 gallon tank failed the September 26, 1994 test conducted by Okar Equipment, and was reported as DEC Spill No. 94084081. There reportedly was a small hole in the top of the tank, which was repaired and about two cubic yards of contaminated soil was found and removed. In 1995, Certified Tank Testing found that tank #3 (8,000 UST) failed when tested twice and two spill reports were made. It is disputed as to whether the tank was repaired, emptied or taken out of service. On

---

[7]Plaintiffs also paid $150,000 of its purchase price for the properties it purchased into an "Environmental Escrow" fund to pay for the cost of cleanup of the property.

March 13, 1998, the DEC recorded contamination at the Adjoining Parcel, which was listed as a contamination of gasoline to land.[8] The same 3,000 gallon UST reportedly failed again and the fuel was reportedly emptied. Steve Wade of Certified Tank opined that he did believe that the 3,000 gallon tank was not actually leaking.

The Partnership entered into a Stipulation agreement to investigate and remediate the Site at the direction of the DEC, which was finalized on November 8, 1999. However, the following USTs were removed from the Site in September 1999 by Hickory Hill Construction: two 8,000 gallon USTs, one 3,000 gallon UST, one 550 gallon UST and one 1,000 gallon UST. As part of the removal, approximately 176 tons of contaminated soil was excavated and disposed of at a landfill. Soil samples were collected after excavation and tank removal and analyzed for volatile organic compounds ("vocs"). The Hickory Hill consultant identified petroleum related contamination and stated that it was "just very old stuff." See Luther Keyes of Hickory Hill Tr. 51:4 - 52:3 attached as Ex. S to Pls. Facts. Texaco counters that the City records show that as early as May 17, 1940, years before Texaco's involvement at the Site, there was a gas station on the property, which presumably operated with USTs.

In 2004, five years after plaintiffs purchased the Site, additional leaking tanks and significant environmental discharge

---

[8]The DEC assigned spill number 9731823 to the spill recorded on March 13, 1998.

under the building area were discovered by GeoEnvironmental of New York ("GZA"), an environmental contractor.[9] GZA excavated four USTs and found the following three USTs to be deteriorated, corroded, and leaking: "(1) 550 gallon UST still containing 450 gallons of product" and "(1) 1,000 gallon UST and (1) 2,000 gallon UST[.]" Texaco defendants contend that plaintiffs did nothing for six years to investigate the environmental contamination near the sump pit or the floor drains under the building on the Site despite Day informing plaintiffs in 1998 that the sump system in the floor drains needed testing to ascertain the discharge location and the integrity of the drainage system of the building. As a result, Texaco claims that in 2004 GZA discovered significant contamination in that area including 60 tons of contaminated soil and free product in monitoring wells within the building resulting from sump pump or floor drain discharges. Plaintiffs argue that during the six years, they removed five USTs and conducted testing of the pit. Plaintiffs claim they also demanded that defendants undertake further investigation and remediation and they arranged for numerous further studies and work plans including GZA's Remedial Investigation and development of a Remedial Work Plan.

GZA provided Worldwide Geosciences, Inc. ("Worldwide") with the analytical results of samples collected and analyzed as part of

---

[9]GZA performed a Site investigation that included 13 soil probes and 2 test pits. GZA found subsurface soil contamination, groundwater contamination and separate phase product.

GZA's Site investigation. Worldwide's analysis of samples collected and analyzed as part of the Site remedial action concluded that four of the seven samples had chromatograms that were indicative of pre-1975 gasoline and the remaining three showed characteristics consistent with parent gasoline of an age no later than 1985. See Hanna Expert Report at 6. Texaco disputes this fact because according to Texaco, plaintiffs did not inform Worldwide of the contaminated soils it discovered during the excavations in 1999 and 2004 and it did not ask Worldwide to determine the age or source of that contamination.[10] Texaco further states that plaintiffs' expert testified that "he could not rule out" that the product that caused the contamination was the result of product that was produced and leaked onto the property from 1981 to 1985.

In 2005 GZA completed remediation activities at the Site that included the removal of four USTs ("orphan tanks") that were encountered. The orphan tanks encountered on the property were not known by GZA to be present at the Site when they initiated remedial activities. Three excavations were necessary to remove the orphan tanks. On March 5, 2005, a 55 gallon steel UST was encountered that appeared to contain a mix of residual product/water and tank bottom sludge. On August 10, 2005, two excavations occurred. One 1,000

---

[10]Texaco claims that at the deposition of plaintiff's expert, Neil Petersen from Worldwide, he testified that he was never asked by the plaintiffs to test for the age or source of the product that existed around the tanks that were excavated in 1999 or 2004, nor was he provided with free product samples for analysis. See Tr. of Neil Petersen 46:11-48:22.

gallon steel UST and another 2,000 gallon steel UST were encountered and removed. The final excavation involved a 2,000 gallon steel UST with no residual product/water or impacted soil.[11] The identified zones of contamination that were remediated by GZA were present at locations not associated with the location of the USTs installed in 1978 and used by Nu-Way and/or Metro Tire. See Hanna Expert Report at 8.

In response to GZA's efforts, a No-Further Action letter was issued by the DEC on April 28, 2006. Plaintiffs contend that they paid a total of approximately $349,451.38 for environmental response costs, and were only reimbursed $108,000 from Shell, which was responsible for the contamination on the Adjoining Parcel. Further, plaintiffs claim that they incurred legal fees and expenses both in responding to the contamination, selling the Site in spite of the contamination[12] and in bringing this lawsuit.

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment may not be granted unless "the pleadings,

---

[11]The soil contamination encountered was excavated and disposed of at an off-site landfill and the groundwater contamination was treated in-situ with a solution of water and hydrogen peroxide.

[12]In early 2000, plaintiffs claim they negotiated a sale of the Site to Romeo Land Development, LLC ("Romeo"), which was going to construct a CVS store for $1,396,000, with no real estate commission. However, since the contamination remained at the Site after the removal of the USTs, plaintiffs were unable to devote the financial resources at the time to front the costs, and the sale with Romeo fell through as well as later efforts to sell the Site to CVS. According to plaintiffs, due to market factors, they were only able to negotiate a sale of the Site for $1,225,000, less a $77,000 real estate commission, to ESL Federal Credit Union, after the contamination was remediated. When the transaction finally closed on May 22, 2006, plaintiffs realized $247,000 less than they would have received had the deal with Romeo consummated.

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." See 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.) "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." See Gummo v. Village of Depew, 75 F.3d 98, 107 (2d Cir.1996)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)), cert denied, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." See Fed.R.Civ.P. 56(e); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. See Anderson, 477 U.S. at 249; see also Fed.R.Civ.P. 56(e)("When a motion for summary judgment is made and supported, an adverse party may not rest upon the mere allegations or denials of the adverse

11

party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial"). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." See Leon v. Murphy, 988 F.2d 303, 308 (2d Cir.1993). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962).

**II.   New York Navigation Law**

Navigation Law § 181(1) provides in relevant part that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault." In State of New York v. Green, 96 N.Y.2d 403, 405, (2001), the Court of Appeals concluded that an owner of contaminated property is liable as a discharger for cleanup costs where the landowner could control the activities occurring on the property and had reason to believe that petroleum products would be stored there. See State v. Tartan Oil, 219 A.D.2d 111 (3d Dept. 1996) ("Navigation Law Article 12 liability may be imposed upon an owner who neither caused nor contributed to the discharge, but is responsible for cleanup and removal costs solely by virtue of its ownership of the property on which the discharge occurred"). Thus,

in Green, the owner of a mobile home park was liable for a discharge from an above-ground kerosene tank at a tenant's home because the owner "was in a position to control the site and source of the discharge... [and as lessor,] could have reasonably expected [the tenant] to use fuel to heat her home." See id. at 407.

### A.   FCA is a "discharger" under the Navigation Law

In its motion for summary judgment, Texaco contends that plaintiffs, as a matter of law, should be deemed a "discharger" under the New York Navigation Law, and as such, is strictly liable for remediation costs. See Defs. Br. at 11. Based on § 181(1) of the Navigation Law and cases in support thereof, the Court finds that FCA is a "discharger." Plaintiffs owned the Site in 2004 when three leaking USTs were removed including 60 tons of contaminated soil. In addition, in 2005 GZA completed remediation activities at the Site that included the removal of four orphan tanks, some of which appeared to contain a mix of residual product/water and tank bottom sludge that impacted the soil. See N.Y. Nav. Law at § 181(1) (McKinney's 2004)(providing that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained, as defined in this section").

### B.   FCA is a "Faultless Discharger" under the Navigation Law

In plaintiffs' partial motion for summary judgment, while plaintiffs do not concede that they are a "discharger" under the

New York Navigation Law, plaintiffs contend that even if they are deemed a "discharger," they may still pursue their Navigation Law claims against Texaco because they are "faultless" dischargers. See Pls. Br. at 5-6. In support of their position, plaintiffs cite White v. Long, 85 N.Y.2d 564 (1995), arguing that the court in White expressly held that even if a landowner could be characterized as a discharger under the Navigation Law, the landowner could nevertheless maintain an action as an "injured" person pursuant to Navigation Law § 181(5) if the contamination was not the fault of the landowner. See Green, 96 N.Y.2d at 408; see also Hjerpe v. Glogerman, 280 A.D.2d 646 (2d Dept. 2001). Texaco responds by arguing that "faultless dischargers" applies to cases that involve midnight dumpers, which is not the case here. See Green, 96 N.Y.2d at 407.

Texaco mischaracterizes the meaning of "faultless discharger" under the law. The New York Court of Appeals wrote in White:

> Although even faultless owners of contaminated lands have been deemed "dischargers" for purposes of their own section 181(1) liability, where they have not caused or contributed to (and thus are not "responsible for") the discharge, they should not be precluded from suing those who have actually caused or contributed to such damage.

See White, 85 N.Y.2d at 564; see also Volunteers of America of Western New York v. Heinrich, 90 F.Supp.2d 252 (W.D.N.Y. 2000). The facts of the White case are similar to this case since the owner purchased the property with knowledge of the presence of six tanks and some contamination, but was not aware of a seventh orphan tank

that was later found. Like White, plaintiffs are "faultless" because they did not cause or contribute to the discharges at the Site.

Further, Texaco contends that plaintiffs' purchase of the Site with knowledge of the contamination makes them liable as dischargers. See Defs. Br. at 12. In this regard, Texaco claims that plaintiffs waited five years to remediate the property and permitted petroleum to leak into the Site during such time. See id. The undisputed facts, however, do not support this view. When the plaintiffs purchased the property on January 20, 1999, they were aware of five USTs, which were removed within eight months of the purchase by Hickory Hill Construction in September 1999. The five USTs included the following: two 8,000 gallon USTs, one 3,000 gallon UST, one 550 gallon UST and one 1,000 gallon UST. Thereafter, the plaintiffs entered into a Stipulation agreement to investigate and remediate the Site at the direction of the DEC, which was finalized on November 8, 1999. With full oversight and approval of the DEC, plaintiffs undertook to more fully characterize the nature and extent of the contamination on the Site. It was only then that they learned of the four orphan tanks and removed them upon discovery.

The court concludes that Texaco has failed to meet its burden to show that plaintiffs are strictly liable under the New York

Navigation Law.[13] Thus, plaintiffs may proceed to seek indemnification and damages under Navigation Law § 181(5) and are not limited to contribution claims under Navigation Law § 176(8).[14]

### C. Texaco is Strictly Liable under Navigation Law § 181(5)

Plaintiffs argue that Texaco is strictly liable under Navigation Law § 181(5). The language of the statute provides the following right of action:

> Any claim by any injured person for the costs of cleanup and removal and direct and indirect damages based on the strict liability imposed by this section may be brought directly against the person who discharged the petroleum.

See Navigation Law § 181(5). On November 1, 1960, Texaco became the owner of the Site, which included a gasoline station. Between 1961 and 1981, Texaco sub-leased the Site to a number of operators, who operated it as a service station. Texaco eventually repurchased the Site from Leased Stations in 1980. During this time, it is undisputed that 750 gallons of gas was spilled in 1978 when Texaco installed an 8,000 gallon tank on the Site. The 8,000 gallon tank was installed by Texaco on February 15, 1978 and 750 gallons of petroleum leaked from that particular tank, which was subsequently

---

[13]The Court need not consider and decide plaintiffs' alternative argument relating to its entitlement to the third party defense found in Navigation Law § 181(4).

[14]In Volunteers of America, 90 F.Supp.2d at 259, this Court allowed the purchaser of a contaminated site to bring a contribution claim under Navigation Law § 176(8). The Court held that under the plain language of the statute, a plaintiff "does have the right to seek contribution from any other responsible party for costs incurred in providing cleanup or removal of discharge or petroleum[.]" See id. The same analysis applies here. Texaco is liable as a matter of law to make contribution to plaintiffs under § 176(8) of the Navigation Law.

replaced on May 10, 1978.[15] In addition, Texaco left four leaking orphan tanks when it sold the Property in 1981.

Texaco argues that there are numerous issues of material fact relative to whether it is a discharger and thus precluding plaintiffs' partial motion for summary judgment. First, Texaco claims that as early as 1940, prior to Texaco's involvement with the Site, the property was used as a gas station "presumably operating with underground storage tanks." See Defs. Opp. Br. at 3. Texaco offers a building department record to support its position. However, a single building department record falls short of raising an issue of fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (party against whom summary judgment is sought, however, "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial."(emphasis in original removed)). No evidence has been provided by Texaco regarding any leaks from this station in 1940, or even any evidence that any tanks at this station were located underground at that time.

Second, Texaco argues that the opinion of its expert creates further issues of material fact precluding plaintiffs' motion for

---

[15]Texaco does not dispute the discharge, but rather attempts to raise a question of fact as to whether or not this discharge was remediated, contending that remediation records were not located. See Defs. Response to Pls. Statement of Facts at ¶ 14. However, Texaco has no evidence to the contrary upon which to rely to support its argument that there is a question of fact.

summary judgment. Texaco contends that the report of its expert, Tyler Gass,[16] concludes that "with so many sources of contamination and post-1985 reports of UST releases it seems unreasonable to attempt to characterize all the contamination on the site based on two soil samples, as well as to make the claim that the entire site is contaminated by pre-1985 gasolines." See Def. Opp. Br. at 6. There is no question that Mr. Gass' conclusion disputes the findings of the First Report of plaintiffs' expert, Neil Peterson. However, Mr. Gass fails to provide an opinion as to the findings of Mr. Petersen's Second and Third Reports in which Mr. Peterson reviewed fifteen additional samples taken in other areas of the Site. In his subsequent reports, Mr. Petersen concluded that at least one sample was pre-1980 and that four out of seven samples had chromatographic characteristics that would limit the gasoline to at least pre-1975. Moreover, Texaco has been unsuccessful in offering expert evidence to rebut plaintiffs' other expert, Ernest Hanna of GZA, who directed remediation of the Site, and has opined that "[o]n-Site contamination that required remediation resulted from historical Site operation prior to 1981." See Hanna Rep. at 8. Mr. Gass has not been able to offer an opinion that any release occurred during plaintiffs' association with the Site.

---

[16]Plaintiffs assert that Mr. Gass is a hydrogeologist, but only offers opinions as a forensic chemist, which is not his field of expertise. Plaintiffs claim that Mr. Gass has only done forensic analysis in a handful of cases with Texaco as his only client and has never visited the Site. See Pls. Reply Br. at 2. Thus, plaintiffs contend that Mr. Gass' opinions should not even be heard since he is testifying outside his field under Federal Rules of Evidence 702. There is currently no pending motion to preclude expert testimony before the Court and thus the Court need not decide the issue.

Third, Texaco argues that issues of material fact exist regarding which entity actually set in motion events that resulted in the discharge at the Site. See Def. Opp. Br. at 9. However, it is undisputed that Texaco had oversight and/or management of the 8,000 gallon UST that was installed and immediately removed after a spill occurred in 1978. See Huntington Hosp. v. Andron Heating and Air Conditioning, Inc., 250 A.D.2d 814 (2d Dept. 1998) (Court held that status as general contractor, responsible for overall supervision of the installation of the USTs, may subject it to liability as a "discharger" under the Navigation Law). Further, even if it could be demonstrated that certain USTs started leaking after Texaco left the Site in 1981 as Texaco tries to argue, Texaco still bears the responsibility since it has been shown that Texaco set in motion the events that resulted in discharges at the Site. Texaco is liable under the Navigation Law because "no proof is required of a specific wrongful act or omission which directly caused the spill" in order to impose liability. See Domermuth Petroleum Equipment and Maintenance Corp. v. Herzog v& Hopkins, Inc., 111 A.D.2d 957, 958 (3d Dept. 1985). Thus, Texaco is strictly liable under the Navigation Law.

### III. **Assumption of the Risk Doctrine**

Texaco argues that under common law principles, it "cannot be held negligent where the danger or risk alleged to have caused the injury to the Plaintiff was open and obvious or expressly assumed

by the Plaintiff." <u>See</u> Defs. Br. at 12-13. Texaco further maintains that when determining liability between two Navigation Law dischargers, principles of fault dictate responsibility and the assumption of risk doctrine is applicable. <u>See</u> Defs. Reply Br. at 7. Plaintiffs counter by contending that the assumption of the risk doctrine does not bar plaintiffs' claim in this case. <u>See</u> Pls. Opp. Br. at 6.

As an initial matter, the Court has already concluded that under the Navigation Law, plaintiffs are "faultless" dischargers. Accordingly, the Court has found that plaintiffs are not strictly liable under the Navigation Law and are entitled to recover against a prior owner of the Site for Navigation Law violations. In addition, the Court has determined that Texaco is strictly liable under the Navigation Law[17] and as such, to the extent that the Navigation Law involves strict liability, the doctrine of assumption of the risk is not applicable. Thus, Texaco is not entitled to summary judgment based on the assumption of the risk doctrine.

### IV.   <u>Statute of Limitations</u>

Texaco contends that plaintiffs' property damage claims are barred by the three-year statute of limitations under CPLR 214-c.

---

[17]Navigation Law § 181(1) states in pertinent part that "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained...." <u>See</u> Navigation Law § 181(1); <u>see also</u> <u>State v. Green</u>, 271 A.D.2d 11 (3d Dept. 2000) ("Navigation Law § 181(1) imposes liability upon the owner of the system from which a discharge occurred, regardless of fault.")

See Defs. Br. at 17. Texaco further asserts that plaintiffs had knowledge of the environmental contamination at the Site on the date of its purchase in January 1999. See id. at 18. Texaco claims that the statute of limitations relating to all non-remediation damages expired in January 2002. See id. However, Texaco contends that plaintiffs did not commence this action until February 25, 2003, which is outside the three-year limitations period as to claims for non-remediation damages. See id. Plaintiffs argue that their claims fall within the category of "indirect damages" under Navigation Law § 181(2), which is subject to the six-year statute of limitations. See Pls. Opp. Br. at 11. According to plaintiffs, their claims for "non-remediation" damages are thus not time barred.[18] See id.

Plaintiffs argument that Navigation Law § 181(2) does not bar their claims is unavailing. Well settled New York law states that "[t]he applicable Statute of Limitations for an action to recover damages for injury to property caused by petroleum contamination is three years, computed from the date of discovery of the injury or from the date when, through the exercise of reasonable diligence, such injury should have been discovered." See Kozemko v. Griffith Oil Co., 256 A.D.2d 1199, 1200 (4th Dept. 1998); see also Jensen v.

---

[18]Plaintiffs are attempting to assert claims for lost profits and lost income. However, the New York Court of Appeals has held that even consequential tort damages in the form of lost profits/lost income are governed by a three-year statute of limitations. See Community Network Service Inc., v. Verizon New York, Inc., 39 A.D.3d 300, 301 (1st Dept. 2007).

General Elec. Co., 82 N.Y.2d (1993); Patel v. Exxon Corp., 284 A.D.2d 1007, 1008 (4th Dept. 2001)[19]; Oliver Chevrolet Inc., v. Mobil Oil Co., 249 A.D.2d 793 (3d Dept. 1998) (holding that three-year statute of limitations started to run when plaintiffs became aware that some amount of leakage had occurred, even though plaintiffs were unaware of precise nature or extent of damage on property). Because plaintiffs' claims may be properly classified as injury to property and as such considered non-remediation damages, the three-year statute of limitations under CPLR 214-c is applicable. Thus, plaintiffs' non-remediation damages claims are untimely and must be dismissed.

Plaintiffs also claim that to the extent that damages arise from the orphan tanks, their claims are timely under CPLR 214-c because the "two-injury rule" applies in this case. See Pls. Opp. Br. at 12. Under this rule, which evolved in the context of exposure-related medical problems but which has since been applied to toxic torts generally, where the statute of limitations has run on one injury, a later injury that is "separate and distinct" from the first is still actionable under New York law. See Braune v. Abbott Labs., 895 F.Supp. 530, 555-56 (E.D.N.Y.1995) (citing Fusaro v. Porter-Hayden Co., 145 Misc.2d 911, 915 (N.Y.Sup.1989),

---

[19]In the Patel case, the plaintiffs claimed that they sustained both remediation and non-remediation damages as a result of leaking petroleum from underground storage tanks on their property. See Patel, 284 A.D.2d at 1008. The Court held that non-remediation damages are subject to a three year statute of limitations and dismissed the part of plaintiffs' action seeking non-remediation damages.

aff'd,170 A.D.2d 239 (1st Dep't 1991)); see also Griffin v. Garratt-Callahan Co., 74 F.3d 36, 40 (2d Cir.1996) (applying two-injury rule but finding that the plaintiff's two injuries were related and therefore time-barred); Bimbo v. Chromalloy American Corp., 226 A.D.2d 812 (3d Dep't 1996) (since defendants had not shown that pollution of plaintiffs' soil and shallow groundwater was an "outgrowth, maturation or complication" of contamination of plaintiffs' well water, lower court correctly decided that dismissal was premature).

Contrary to the plaintiffs' contentions, the so-called "two-injury rule" is inapplicable. It is undisputed that 750 gallons of gas was spilled in 1978 when Texaco installed an 8,000 gallon tank on the Site. The 8,000 gallon tank was installed by Texaco on February 15, 1978 and 750 gallons of petroleum leaked from that particular tank, which was subsequently replaced. While the four orphan tanks were not discovered until 2005 when GZA completed remediation activities at the Site, any contamination found at that time was caused by Texaco's leaking orphan tanks, and was an "outgrowth, maturation or complication" of the 1978 contamination since they are all part of the same environmental contamination claim. Thus, the diminution in value of the plaintiffs' property is an outgrowth, maturation, or complication of the original contamination, which occurred in 1978, and not a separate and distinct injury. See State of N.Y. v. Fermenta ASC

Corp., 238 A.D.2d 400, 401-402 (2d Dept. 1997).

**V.   Attorneys' Fees Under the RCRA**

The cost recovery provisions of RCRA, 42 U.S.C. § 6972(e), provide in pertinent part:

> The court, in issuing any final order in any action brought pursuant to this section or section 6976 of this title, may award costs of litigation (including reasonable attorney and expert witness fees) to the prevailing or substantially prevailing party, whenever the court determines such an award is appropriate.

Id. The plain language of this section provides that an award of attorney's fees is within the sound discretion of the district court. See § 6972(e); see also Daque v. City of Burlington, 935 F.2d 1343, 1357 (2d Cir.1991).

In Daque, the Second Circuit, analogizing the Attorney's Civil Rights Fee Awards Act, 42 U.S.C. § 1988, determined that recovery of fees under the RCRA, 42 U.S.C. § 6972(e), is a two prong test. First, the plaintiff must be the prevailing, or substantially prevailing party. See Daque, 935 F.2d at 1357 (citing Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)); Texas State Teachers Ass'n v. Garland Indep. Sch. Dist., 489 U.S. 782 (1989) (plaintiff must prevail on "significant issue test" rather than "central issue" to recover). The second prong is that the district court must exercise its discretion in awarding the amount of fees under the statute. See Daque, 935 F.2d at 1358 (citing Hensley, 461 U.S. at 437) (affirming district court's granting of fees).

Plaintiffs argue that they "will be 'prevailing parties'

24

eligible for attorneys fees under RCRA if they succeed on any significant issue" in this litigation. <u>See</u> Pls. Br. at 9. Plaintiffs essentially urge this Court to exercise its discretion under the second prong and grant its attorney's fees. In addition, plaintiffs rely on <u>Atlantic States Legal Foundation, Inc. v. Eastman Kodak Co.</u>, 933 F.2d 124 (2d Cir. 1991) for the proposition that even though they have remediated the Site, this does not negate plaintiffs' claim for attorneys' fees. However, as an initial matter, the RCRA does not provide for compensatory damages. <u>See Mehrig v. KFC Western, Inc.</u>, 516 U.S. 479 (1996) (holding that RCRA does not authorize private cause of action to recover prior cost of cleanup of toxic waste); <u>see Prisco v. A&D Caring Corp</u>., 168 F.3d 593, 608 (2d Cir. 1999) ("RCRA is a comprehensive environmental statute that governs the treatment ... and disposal of ... hazardous waste.") (quoting <u>Mehrig</u>, 516 U.S. at 483).

In addition, the overriding purpose of allowing the recovery of attorney's fees under RCRA is to encourage private enforcement of federal environmental statutes. <u>See Commerce Holding Co. Inc. v. Buckstone</u>, 749 F.Supp. 441, 445 (E.D.N.Y.1990). In considering the purpose of the RCRA, this case is not an attempt to safeguard the environment but is a dispute between two private parties relating to a parcel of contaminated property. It is clear from the undisputed facts that the plaintiffs' suit was only incidentally intended to vindicate public interests.

25

By contrast, RCRA fees have been awarded in cases where private citizens filed actions to stop pollution or toxic dumping on behalf of an entire community. See <u>United States v. Environmental Waste Contr., Inc.</u>, 737 F.Supp. 1485 (N.D. Ind.1990). In <u>Environmental Waste</u>, a citizens group called Supporters to Oppose Pollution, Inc. ("STOP") intervened along with the EPA and prevailed against the operators of the Four County Landfill. The district court awarded fees because STOP had substantially advanced the litigation on behalf of the local community to stop the defendants dumping in unlined disposal areas. See <u>Environmental Waste</u>, 737 F.Supp. at 1488; <u>see also</u> <u>Daque</u>, 935 F.2d at 1343 (property owners' suit against landfill for illegal disposal practices). This Court finds that the type of cases in which attorney's fees have been awarded are distinguishable from the present case. This case involves plaintiffs seeking remediation costs as a result of cleaning up a .44-acre parcel of land. Since the Site has been remediated, based on the No Further Action letter issued by the DEC, plaintiffs will be able to utilize the Site for its originally intended purpose. Accordingly, there is no evidence that the hazardous substances on the Site constitute a present and imminent danger to the community. Therefore, Texaco is not liable for attorneys fees pursuant to the RCRA.

## **CONCLUSION**

For the reasons stated above, Texaco's motion for summary

26

judgment is granted in part and denied in part. Plaintiff's motion for partial summary judgment is granted in part and denied in part. The court therefore finds the following: (1) Texaco is strictly liable under § 181 of the New York Navigation Law; (2) Texaco has failed to meet its burden to show that plaintiffs are strictly liable under the New York Navigation Law and plaintiffs may, therefore proceed to seek indemnification and damages under Navigation Law § 181(5) and are not limited to contribution claims under Navigation Law § 176(8); (3) the Court need not consider and decide plaintiffs' alternative argument relating to its entitlement to the third party defense found in Navigation Law § 181(4); (4) Texaco is not entitled to summary judgment based on the assumption of the risk doctrine; (5) summary judgment is granted to Texaco with respect to plaintiffs' non-remediation damages claims since they are untimely under CPLR 214-c; (6) Texaco is not liable for attorneys fees pursuant to the RCRA and thus plaintiff's motion for summary judgment is denied as to this claim.

**ALL OF THE ABOVE IS SO ORDERED.**

    s/Michael A. Telesca
     MICHAEL A. TELESCA
United States District Judge

Dated:    Rochester, New York
          February 4, 2008

27